Filed 9/25/23  In re Journee E. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOURNEE E., a Person Coming Under the Juvenile Court Law. | B323959 (Los Angeles County Super. Ct. No. 22CCJP02252B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANDRIA E., Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Dismissed as moot.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

_____

Andria E. (Mother) appeals from the juvenile court's disposition order declaring three-year-old Journee E. a dependent of the court under Welfare and Institutions Code section 300, former subdivision (b)(1),[1] and removing her from Mother's physical custody under section 361, subdivision (c). Mother's sole contention on appeal is that the court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the inquiry and notice provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and related California law. Mother argues the Department failed to interview the maternal grandmother and two maternal great-aunts, and the notice sent to the Seminole Tribe of Florida contained errors that rendered the notice defective.

While Mother's appeal was pending, the juvenile court ordered the Department to conduct further ICWA inquiry and to send updated ICWA notices if warranted based on further information from the additional interviews. Because the court

_____

[1] The Legislature amended Welfare and Institutions Code section 300, effective January 1, 2023, in part by revising subdivision (b)(1) to specify in separate subparagraphs ways in which a child may come within the jurisdiction of the juvenile court due to the failure or inability of the child's parent or guardian to adequately supervise or care for the child. Further undesignated statutory references are to the Welfare and Institutions Code.

has now ordered the Department to interview the maternal relatives, and the Department interviewed the maternal grandmother and great-aunts, we dismiss the appeal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Investigation, Dependency Petition, and Detention*

On June 6, 2022 the Department received a referral after Mother went to urgent care and disclosed she had active thoughts about stabbing herself, hitting pedestrians and other vehicles with her car, and drowning Journee and her half-sister, six-year-old Nyla E.[2]  When Mother was placed on a psychiatric hold and admitted to the mental health facility, she became verbally and physically aggressive towards staff.  Mother left the facility after repeatedly kicking and ramming the locked double doors, which eventually opened.

On June 10, 2022 the Department filed a petition under section 300, former subdivision (b)(1), alleging Mother "ha[d] a history of mental and emotional problems including suicidal and homicidal ideation, auditory hallucinations, delusional thinking,

---

[2]    Mother's appeal only involves Journee.  The juvenile court found as to Nyla that Texas was the home state and Mother had violated a Texas family law custody order by leaving Texas with Nyla.  However, the court proceeded with the dependency proceeding as to Journee because the Texas social services agency had not filed a dependency proceeding in Texas and there was no open family law matter as to Journee.  The juvenile court found Jeremy R. was Journee's alleged father and the Department had made due diligent efforts to contact him, but his whereabouts were unknown.  Jeremy is not a party to this appeal.

3

and aggressive behaviors" that rendered her incapable of providing regular care of Journee and Nyla. The children were removed and placed with their maternal great-grandmother, Jennice W.

At the June 13, 2022 detention hearing, the juvenile court detained the children and continued their placement in Jennice's home. At the hearing, the court asked Jennice and a maternal great-aunt (who was not identified) about the family's Indian ancestry. Jennice stated she had Indian ancestry but she did not know the Indian tribe's name. The maternal great-aunt said the family's Indian ancestry was "so far removed," and she likewise did not know the tribe's name. Mother filed a parental notification of Indian status form, on which she indicated that "[p]ossibly" the maternal great-grandmother was a member of a federally recognized tribe, "but details [were] unknown."

B.     *The Jurisdiction and Disposition Report and Hearings*
According to the jurisdiction and disposition report, the social worker attempted to interview Mother on July 6, 2022, but Mother "refused to provide any historical family information." The social worker also interviewed Jennice regarding the maternal family's Indian ancestry. Jennice denied that she, Jenikque M. (maternal grandmother), Mother, Nyla, or Journee was a registered member of a federally recognized Indian tribe or had lived on a tribal reservation. But Jennice believed her family was descended from the Seminole Tribe in Florida "based on family stories, photographs, observations of ancestral relatives' facial characteristics, physical traits-appearances and forefather regional history." Jennice provided information regarding her birthdate and birthplace (Carson, California); the maternal great-

4

great-grandmother Mattie W.'s birthdate, birthplace (Springfield, Florida), and place of death (Inglewood, California); maternal great-great-grandfather Leo W.'s birthdate; and maternal great-great-great-grandmother Lula H.'s birthdate and birthplace (Springfield, Florida). Jennice explained the family was descended from the Seminole Tribe through Mattie's mother, Lula, but Jennice had no evidence that either Mattie or Lula was registered with a federally recognized Indian tribe or lived on a tribal reservation.

At the August 3, 2022 jurisdiction hearing, the juvenile court sustained the amended allegations under section 300, former subdivision (b)(1), that Mother's mental and emotional problems rendered her incapable of providing regular care for Journee. At the Department's request, the court continued the disposition hearing to September 20 for ICWA compliance. The court ordered the Department to re-interview Jennice and to interview other maternal relatives regarding their Indian ancestry, and to provide ICWA notice to the Seminole Tribe of Florida.

On September 8, 2022 the social worker sent an ICWA notice of the disposition hearing to Mother, the Seminole Nation of Oklahoma, the Bureau of Indian Affairs, and the Secretary of the Interior. The ICWA notice stated Journee "may be eligible for membership" in the "Seminole Nation of Oklahoma." The notice provided information on Journee's birthdate and birthplace (Harris County, Texas); Mother's former and current address, birthdate and birthplace (Carson, California); Jeremy's birthdate; Jenikque's birthdate, birthplace (California), and state of residency (Washington); maternal grandfather Andre E.'s date

and place of death (California); Jennice's current address, birthdate, and birthplace (Carson, California); and maternal great-grandfather John M.'s birthdate, birthplace (Pennsylvania), and state of residency (California). No information was provided as to Jeremy's parents or grandparents. On the forms, some information was crossed out and corrected, including to change the name of the tribe from "does not apply" to "Seminole"; to change Mother's birthplace from "unknown" to Carson, California; and as to some relatives, to change "unknown" to "does not apply." (Capitalization omitted.)

Attached to the ICWA notice was a one-page summary of the information provided by Jennice, including the maternal great-great-grandmother Mattie's birthdate, birthplace (Springfield, Florida), and burial place (Inglewood, California) and the maternal great-great-great-grandmother Lula's birthdate, birthplace (Springfield, Florida), and burial place (Panorama City, Florida). In a September 22, 2022 letter, the Seminole Nation of Oklahoma responded that the tribe checked its enrollment "based on the information exactly as provided by you," and Journee, the parents, and the grandparents were not enrolled members. (Boldface omitted.)[3]

The Department's last minute information for the court provided an update on its ICWA inquiry. The social worker re-interviewed Jennice on September 7; Jennice had no additional information on her family's Indian ancestry. Jennice reported

---

[3]    We grant the Department's July 26, 2023 motion for judicial notice of the letter from the Seminole Nation of Oklahoma. (Evid. Code, §§ 452, subd. (d), 459, sub. (a).)

maternal great-grandfather John M. did not have any Indian ancestry. The social worker had previously interviewed Jenikque (the maternal grandmother), who stated she was not registered with any Indian tribe and had not lived or attended school on a tribal reservation. Jenikque indicated Jennice was the family historian and had more information regarding the family's Indian ancestry than she did. Mother did not have contact information for Jeremy or his relatives. Jeremy's whereabouts remained unknown.

At the September 20, 2022 disposition hearing, the juvenile court declared Journee a dependent of the court and removed her from Mother's physical custody. The court ordered Mother to submit to weekly random and on-demand drug and alcohol testing, a psychological assessment, and a psychiatric evaluation. The court also ordered Mother to participate in mental health counseling and individual counseling and to take all prescribed psychotropic medication. The court granted Mother monitored visits with Journee for a minimum of two times per week for two hours each visit. The court did not make an ICWA finding at the hearing.

Mother timely appealed on September 28, 2022.

C.   *Postjudgment Evidence*

On September 28, 2022 the social worker sent an IWCA notice to the Seminole Tribe of Florida, which was received by the tribe.[4] In an October 7, 2022 letter, the Seminole Tribe of Florida

---

[4]    We grant the Department's July 26, 2023 motion for judicial notice of the certified mail receipt indicating notice to the

stated the tribe had "researched the ICWA notice." The Seminole Tribe wrote, "Journee [E.] is not an enrolled member of the Seminole Tribe and is not eligible for enrollment within the Seminole Tribe based on the information provided and researched by the Tribe."

On June 13, 2023 the juvenile court issued an order stating the Department "has interviewed the maternal grandmother (Jenikque [M.]) and maternal great-grandmother (Jennice [W.]) extensively about the family's Native American ancestry. DCFS provided on Judicial Council form ICWA-030 notice to the Seminole Nation, Bureau of Indian Affairs, and Secretary of the Interior that included the information provided by the maternal grandmother and maternal great-grandmother. [¶] DCFS shall interview/attempt to interview any other available relatives, including the maternal great-aunts (Katherine [W.] and Denise [W.]) to ascertain if they have additional information regarding the family's Native American ancestry other than that provided by the maternal grandmother and great-grandmother. [¶] If, and only if, further information is derived from the additional interviews, DCFS shall send updated notices to the relevant tribe(s) and agencies."

According to the Department's September 5, 2023 last minute information for the court, on August 25, 2023 the social

---

Seminole Tribe of Florida was sent on September 28, 2022. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) The Department's request does not include the ICWA notice that was sent to the tribe. We also grant the Department's motion for judicial notice of the October 7, 2022 letter from the Seminole Tribe of Florida to the Department.

worker interviewed Katherine and Denise to elicit any additional ICWA information.  The report states "[b]oth responded that they had no further information to provide [other] than what was already provided to the Department and the Court."[5] ~(9/7/23 RJN Ex. 1)~

## DISCUSSION

A.    *ICWA Inquiry and Notice Requirements*

ICWA and California law require in dependency proceedings that where the court knows or has reason to know an Indian child is involved, notice must be given to the relevant tribes.  (25 U.S.C. § 1912(a); § 224.3, subd. (a); *In re Isaiah W.* (2016) 1 Cal.5th 1, 5; *In re Rylei S.* (2022) 81 Cal.App.5th 309, 317 (*Rylei S.*); Cal. Rules of Court, rule 5.481(c)(1).)  The notice requirement is at the heart of ICWA because it "enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding."  (*In re Isaiah W.*, at p. 5; accord, *In re Antonio R.* (2022) 76 Cal.App.5th 421, 428 (*Antonio R.*).)

The juvenile court and the Department "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."  (§ 224.2, subd. (a); see *In re Isaiah*

---

[5]    On June 21, 2023 we granted the Department's motion for judicial notice of the June 13 order.  We also grant the Department's September 7, 2023 motion for judicial notice of the September 5 last minute information for the court.  (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

9

*W., supra*, 1 Cal.5th at p. 9; *In re J.C.* (2022) 77 Cal.App.5th 70, 77 (*J.C.*).)  The duty to inquire begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child.  (*Rylei S., supra*, 81 Cal.App.5th at p. 316; *J.C.*, at p. 77; *In re H.V.* (2022) 75 Cal.App.5th 433, 437.)

Section 224.2, subdivision (b), imposes on the Department a duty to inquire whether a child in the Department's temporary custody is an Indian child, which "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."  (See Cal. Rules of Court, rule 5.481(a)(1) [the Department "must ask . . . extended family members . . . whether the child is or may be an Indian child"].)  "The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families."  (*Antonio R., supra*, 76 Cal.App.5th at p. 430; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["The juvenile court's duty to inquire . . . is independent of any obligation on the part of the parents of the dependent child."].)  As we have repeatedly held, "Where the Department fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of an adequate inquiry, the error is in most circumstances . . . prejudicial and reversible."  (*Antonio R.*, at p. 435; accord, *J.C., supra*, 77 Cal.App.5th at pp. 80-81.)

10

In addition, section 224.2, subdivision (e), imposes a duty of further inquiry if the juvenile court or the Department "has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child." "Further inquiry includes, but is not limited to," interviewing "extended family members," contacting the Bureau of Indian Affairs, and contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (See Cal. Rules of Court, rule 5.481(a)(4) [if the social worker "knows or has reason to know or believe that an Indian child is or may be involved," further inquiry must be conducted as soon as practicable by interviewing "'extended family members,'" and contacting the Bureau of Indian Affairs, "the tribes, and any other person who reasonably can be expected to have information regarding the child's status or eligibility"].)

B.    *The Juvenile Court's Order Requiring the Department To Interview the Maternal Relatives Moots Mother's Appeal*

Mother contends the Department failed to comply with ICWA because the social worker did not interview the maternal grandmother (Jenikque) and two maternal great-aunts, Katherine and Denise. Contrary to Mother's contention, the social worker interviewed Jenikque regarding the maternal family's Indian ancestry. Jenikque reported Jennice was the family's historian and had more information about the family's Indian ancestry than she did.

However, the Department concedes the record does not reflect whether, at the time of Mother's appeal, Katherine and

11

Denise were interviewed regarding the family's Indian ancestry. Although the juvenile court briefly questioned a maternal great-aunt at the detention hearing, the great-aunt is not identified in the record. The social worker interviewed Katherine and Denise regarding the allegations in the dependency petition, but he did not ask them about the family's Indian ancestry. Under section 224.2, subdivision (b), the Department had an obligation to inquire of extended family members (and others with an interest in the child) as to Journee's possible Indian ancestry.[6]

---

[6] We recognize that under ICWA the term "extended family member" is defined by the law or custom of the Indian child's tribe, or absent law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c) ["As used in connection with an Indian child custody proceeding, the terms 'extended family member' and 'parent' shall be defined as provided in Section 1903 of the federal Indian Child Welfare Act."].) The Department does not, however, contend there was no duty to interview Katherine and Denise. Further, the duty of inquiry under section 224.2, subdivision (b), includes "but is not limited to" extended family members, and it also includes "others who have an interest in the child." And the duty of further inquiry under section 224.2, subdivision (c)(2), likewise states the duty "is not limited to" contacting extended family members, as well as any person "that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." It is reasonable to expect the maternal great-aunts would have had information regarding Journee's possible Indian ancestry given Mother's statement on the parental notification of Indian status form that possibly the maternal great-grandmother (Jennice) was

(See *Rylei S., supra*, 81 Cal.App.5th at p. 318; *J.C., supra*, 77 Cal.App.5th at p. 77; *Antonio R., supra*, 76 Cal.App.5th at p. 431.)  The Department failed to satisfy its duty of inquiry under sections 224.2, subdivisions (b) and (e).  There is also no evidence the Department had informal contact with the Seminole Tribe of Florida as required by section 224.2, subdivision (e)(2)(C).  (*Rylei S.*, at pp. 319-320 [Department was required to make informal contact with tribe under section 224.2, subdivision (e)(2)(C)]; *In re K.T.* (2022) 76 Cal.App.5th 732, 744 [child protective service agencies "do[] not discharge their duty of further inquiry until they make a 'meaningful effort' to locate and interview extended family members and to contact [the Bureau of Indian Affairs] and the tribes"].)

Mother contends the failure of the Department to interview the maternal great-aunts requires reversal of the disposition order.  However, as discussed, on June 13, 2023, while Mother's appeal was pending, the juvenile court ordered the Department to interview Katherine and Denise and "any other available relatives," and to send updated ICWA notices to the relevant tribes if the additional interviews yielded further information.  Further, on August 25, 2023 the social worker interviewed Katherine and Denise to elicit additional information on whether Journee was an Indian child, and Katherine and Denise indicated they did not have any additional information.

The Department urges us to find Mother's appeal is now moot under *In re D.P.* (2023) 14 Cal.5th 266 and *In re Baby Girl*

---

a member of the Seminole Tribe, and the fact the great-aunts were Jennice's siblings.

*M.* (2022) 83 Cal.App.5th 635.[7]  We agree with the Department that Mother's appeal is now moot.

The Supreme Court in *In re D.P., supra*, 14 Cal.5th at page 276 clarified the mootness doctrine:  "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." '  [Citation.]  A case becomes moot when events " 'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant [the plaintiff] any effect[ive] relief.' "  [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the plaintiff must complain of an ongoing harm.  Second, the harm must be redressable or capable of being

[7]  The Department argues in the alternative that Mother's appeal is not ripe under *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461 because the juvenile court has not yet made a finding whether ICWA applies.  In *J.J.*, the mother petitioned for extraordinary relief after the juvenile court denied family reunification services and set a permanency planning hearing under section 366.26.  (*Id.* at p. 450.)  The Court of Appeal granted the writ petition and remanded for "the juvenile court to set a hearing and modify its dispositional orders, providing mother with appropriate reunification services."  (*Id.* at pp. 461-462.)  However, the court found the mother's ICWA claim was not ripe for review "because the juvenile court made no final ICWA ruling at or before the challenged dispositional hearing as to whether the ICWA applied to the proceedings."  (*Id.* at p. 461.)  We do not reach the Department's ripeness argument because we dismiss the appeal as moot.

rectified by the outcome the plaintiff seeks." The court specified that the mootness doctrine applies in the dependency context. (*Ibid.*)

The parents in *In re D.P.* challenged on appeal the jurisdiction finding that their infant child was at substantial risk of suffering serious physical harm, but while their appeal was pending, the juvenile court terminated its jurisdiction without issuing any orders that continued to impact the parents. (*In re D.P., supra*, 14 Cal.5th at p. 272.) The Supreme Court found the impacts of the juvenile court's jurisdiction finding, including the stigma from the jurisdiction finding, were too speculative, and therefore, the parents' challenge was moot. (*Id.* at p. 282.)

The *D.P.* court explained that "relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' [Citation.] It follows that, to show a need for effective relief, the plaintiff must first demonstrate that he or she has suffered from a change in legal status. Although a jurisdictional finding that a parent engaged in abuse or neglect of a child is generally stigmatizing, complaining of 'stigma' alone is insufficient to sustain an appeal. The stigma must be paired with some effect on the plaintiff's legal status that is capable of being redressed by a favorable court decision." (*In re D.P., supra*, 14 Cal.5th at p. 277.) The court provided as examples of non-moot challenges to jurisdiction findings cases in which a jurisdiction finding affects parental custody rights, limits a parent's contact with his or her child, or results in a disposition order that continues to adversely affect a parent. (*Id.* at pp. 277-278.)

The court emphasized, however, that "[e]ven when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*In re D.P., supra*, 14 Cal.5th at p. 282.) Reviewing courts will generally exercise their discretion when the case presents an issue of broad public interest that is likely to recur, when there may be a recurrence of the controversy between the parties, or when a material question remains for the court to determine. (*Ibid*.) The *D.P.* court also identified additional factors reviewing courts may evaluate when considering whether to exercise their discretion to decide a moot case, including whether a challenged jurisdiction finding could impact current or future dependency proceedings, and the nature of the allegations against the parent (with more egregious findings showing a parent's greater interest in challenging the findings). (*Id*. at pp. 285-286.) In addition, courts may consider why the appeal became moot: for example, principles of fairness may favor discretionary review of cases rendered moot "by the prompt compliance or otherwise laudable behavior of the parent challenging the jurisdictional finding on appeal." (*Id*. at p. 286.)

Because the juvenile court has ordered the Department to interview the maternal great-aunts and to update the ICWA notices with any new information, and the Department interviewed the maternal great-aunts, we cannot provide any effective relief by ordering the juvenile court to take the action it has already taken (or order the Department to conduct interviews it has already conducted). As Division Five of this district observed in *In re Baby Girl M., supra*, 83 Cal.App.5th at pages 638 to 639, in finding the father's appeal of the jurisdiction findings and disposition order based on an inadequate ICWA inquiry was moot, "[A]ll we could order in resolving this appeal is

16

that the Department and juvenile court fulfill their inquiry and notice obligations under ICWA and related California law. Because that is what the Department is already doing, and because we are not in a position to micromanage that process in *this* appeal (detailing, for instance, all those who must be interviewed, what they must be asked, and what must be included in any notice to tribes that is required), there is no effective relief we can now provide." Although the juvenile court has not yet considered the adequacy of the Department's additional inquiry or made an ICWA finding in light of the additional interviews, it is the role of the juvenile court in the first instance to ensure the Department complies with the court's orders and to make the appropriate findings under ICWA.[8]

---

[8] Mother also contends the ICWA notices contain errors because some information was crossed out and handwritten interlineations were added to the notices. Mother argues the record is unclear as to whether the social worker or the juvenile court made the handwritten corrections to the notices. We note the social worker re-interviewed Jennice on September 7, 2022 and sent the ICWA notices on September 8. As the Department argues, it is reasonable to infer the social worker made the handwritten corrections (providing additional information) after re-interviewing Jennice, before sending the ICWA notices by mail. Moreover, there is no evidence the juvenile court made any corrections to the ICWA notice. More concerning is that the ICWA notice was sent initially to the wrong Indian tribe. The certified mail receipt shows the ICWA notice was sent on September 8, 2022 to the Seminole Nation in Oklahoma, and not the Seminole Tribe of Florida. However, the social worker remedied this error by sending the ICWA notice to the Seminole Tribe of Florida on September 28, 2022. The Seminole Tribe of

Mother fails to explain why the June 13, 2023 order and the Department's subsequent interviews of Katherine and Denise do not render her appeal moot. Although she did not file a reply brief, she addressed the Department's mootness argument in her opposition to the Department's July 26, 2023 motion for judicial notice. Mother requests we take judicial notice of her appeal in case number B328354 (*Journee II*) of the juvenile court's November 28, 2022 finding ICWA did not apply and its March 20, 2023 order at the six-month review hearing (§ 366.21, subd. (e)(1)) denying her request to return Journee to her care, as well as the mootness argument made in her opening brief in that case. However, in *Journee II*, Mother raised the same arguments she asserts in her opening brief in this appeal: that the ICWA notice contained cross-outs and handwritten changes and the Department failed to interview the maternal great-aunts. Her opening brief in *Journee II* did not address whether the juvenile court's June 13 order rendered her appeal moot. Moreover, if the court determines the Department has complied with the June 13 order and makes a finding whether ICWA applies, the concerns raised by Mother in this appeal and *Journee II* will be addressed. Finally, Mother fails to articulate any reason why we should exercise our discretion to consider her moot appeal, especially given that she will have another opportunity to argue mootness in *Journee II*. (*In re D.P., supra*, 14 Cal.5th at p. 282.)

---

Florida acknowledged receipt of the notice in its October 7, 2022 letter.

We therefore dismiss Mother's appeal as moot.[9]

**DISPOSITION**

The appeal is dismissed as moot.

FEUER, J.

We concur:

PERLUSS, P. J.

MARTINEZ, J.

---

[9] The Department notes in urging us not to reverse or remand for ICWA compliance that Mother could have achieved ICWA compliance by simply notifying the Department of her concerns, and that as soon as the Department learned of the ICWA error, it raised the issue with the juvenile court. We agree that it would have been more efficient for Mother to have raised her concerns with the Department (and even more efficient for the Department to have fully complied with its obligations in the first place), but in any event, dismissal of Mother's appeal operates as an affirmance of the disposition orders. (*In re D.P., supra,* 14 Cal.5th at p. 285; *In re Jasmon O.* (1994) 8 Cal.4th 398, 413.)